# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **COMMUNITY FOR CREATIVE** | ) | |
| **NON-VIOLENCE**, | ) | |
| 425 Mitch Snyder Place (2nd Street), N.W. | ) | |
| Washington, DC 20001, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** by | ) | |
| ALEX M. AZAR, II Secretary of the | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, DC 20201, and | ) | |
| EMILY W. MURPHY, Administrator of the | ) | |
| GENERAL SERVICES ADMINISTRATION | ) | |
| 1800 F Street, N.W. | ) | |
| Washington, DC 20405, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR BREACH OF CONTRACT, QUIET TITLE, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

Plaintiff Community for Creative Non-Violence ("CCNV") seeks declaratory, monetary, and injunctive relief against the United States because the United States has (i) breached its obligations under a deed with CCNV, (ii) wrongfully purported to attempt to dispossess CCNV from properties that CCNV owns, and (iii) otherwise improperly disrupted and thwarted the lawful activities of CCNV.

## I.     OVERVIEW

In the middle of winter and the middle of a pandemic, the Trump Administration is trying to wrest control of real estate owned by CCNV and used by CCNV in furtherance of its life-saving

mission to house, clothe, feed, and support the homeless men and women of the District of Co-

lumbia. Although a 1993 deed conveyed the properties to CCNV and although CCNV has fully

complied with the conditions attendant on the use of the properties, the Trump Administration has

tried to retake the properties by means of flimsy, meritless, and unsupportable allegations that

CCNV was not using the properties in the "right way."

In truth and in fact, these actions of the United States have nothing to do with any problem

with CCNV, and everything to do with the Government's desire not to honor its deed agreement.

That deed contains conditions on CCNV's ownership, which conditions expire shortly, leaving the

United States with no reversionary interest. The land grab by the United States is an attempt to

regain control when the United States will no longer have any legal claim to any real-property

rights. This land grab is shameful, particularly during this COVID pandemic and the severe hard-

ship it has imposed on less fortunate citizens. It is also contrary to the law and to the terms of the

subject deed, and jeopardizes CCNV's ability to continue to provide vital homeless services such

as shelter, meals, and medical care to its approximately 750 homeless residents and others experi-

encing homelessness, or who may experience homelessness in the near future due to the economic

challenges caused by the ongoing COVID pandemic.

Through this lawsuit, CCNV seeks to clear title that has now been abruptly threatened by

the actions of the United States. CCNV seeks declaratory, monetary, and injunctive relief to de-

clare as unlawful the attempt by the Department of Health and Human Services ("HHS") and the

General Services Administration ("GSA") to take away the properties, and to declare that CCNV

is not in breach of the deed's conditions.

## II.    ALLEGATIONS COMMON TO ALL COUNTS

### A.  Parties

1.      Plaintiff CCNV is a 501(c)(3) charitable organization which operates a large homeless shelter at 425 Mitch Snyder Place (2nd Street), N.W., in Washington.

2.      The United States of America, acting through HHS and GSA, was the owner and manager of the real properties described in more detail below. The United States was the grantor in the deed which is the subject of this action. The Secretary of HHS and the Administrator of GSA are sued in their official capacities.

### B.  Jurisdiction and Venue

3.      This Court has subject-matter jurisdiction under 28 U.S.C. 1331, 28 U.S.C. § 1361, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

4.      Venue is proper in this district because the acts or omissions giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(e).

### C.  Statement of Facts

#### 1.      CCNV's Work and Purpose

5.      CCNV operates a full-service homeless shelter, known as the Federal City Shelter, in a large, aging building owned by the District of Columbia. CCNV's stated mission is to ensure the rights of the homeless and poor are not infringed upon, and that every person has access to life's basic essentials—food, shelter, clothing, and medical care. CCNV is also committed to protecting the rights of the homeless and preparing homeless men and women to re-enter mainstream society as capable, skilled, and productive citizens.

6.      CCNV was founded by Father Guinan in the 1970s as an expression of faith. It started as a soup kitchen, feeding 200 to 300 homeless people a day, seven days a week. Following Mitch Snyder's highly-publicized hunger strikes, the federal government deeded the building to the District of Columbia in 1986 for use as a homeless shelter and allocated funds for repair and renovation. CCNV has been operating a homeless shelter at its current location since 1987. It has expanded its services to try to serve all the needs of those without shelter, including the needs for food, clothing, medical care, case management, educational support, and vocational training. Over the years, CCNV has coordinated its work with the services of other providers of homeless services such as Clean and Sober Streets (drug and alcohol rehabilitation), Unity Health Care, D.C. Central Kitchen, Open Door Shelter (a shelter for women), and New Hope Ministries—all of which have or have had facilities co-located with CCNV at 425 Mitch Snyder Place, N.W.

7.      The current average occupancy of CCNV is approximately 750 residents. During the five-month hypothermia season when homeless individuals seek shelter from the cold weather, the occupancy can increase to over 1,000 residents. Many of the residents of CCNV are seniors, suffer from mental health or chronic health issues, or are physically disabled.

8.      CCNV is led by an all-volunteer Board of Directors, and CCNV's homeless services are provided by an all-volunteer staff of approximately 70 people who live at the shelter. CCNV's volunteer staff includes case-management aides, floor monitors, maintenance workers, security staff, and administrative workers.

9.      The District of Columbia has one of the highest homeless rates in the country. CCNV provides a place for those less fortunate to call home and to avoid the discomforts of living outside in public space. It provides 24-hour shelter for any man or woman who is homeless or needs assistance. It is not an "in and out" shelter, like most homeless shelters in this country; rather,

residents do not have to vacate CCNV's safe haven in the morning with their possessions and return to compete for space in the evening. CCNV provides space for storage of personal items including medications. In conjunction with Unity Health Care, CCNV also provides 24-hour care for those needing continuous medical monitoring outside of a hospital setting.

10.    Among the services that CCNV provides to its residents are:

- Safe and clean beds.

- Clothing, free laundry services, blankets, and sheets.

- Regular daily meals.

- Intake during hypothermia alerts, with approximately 225 additional beds. This requires overnight staffing by 40 to 50 CCNV volunteers.

- Safety and security provided by CCNV volunteer residents.

- Respite Care, provided in conjunction with Unity Health Care, for those needing continuous medical monitoring outside a hospital setting. Approximately 24 men-only beds are staffed by CCNV volunteers on a 24-hour basis.

- Assistance and referral for services through case-management aides.

- Assistance in goal-setting and ongoing progress-tracking for all residents.

- Educational and vocational training and opportunities, assistance in employment searches and interview training.

- Computer center for vocational training on computer skills and to assist residents in job searches.

- Mailing address, which is important for establishing residency, for receiving assistance checks, for employment purposes and for voting.

11.     CCNV's rules require work-eligible residents to participate in training and rehabil-

itation so that the residents can re-enter mainstream economic life. This training can consist of

attending trade or vocational school; obtaining a commercial driver's license; pursuing vocational

opportunities working with D.C. Central Kitchen; job training; online training; access to GED

programs; and connection to benefit programs. Approximately 60% of CCNV's residents are able

and eligible to work, and a majority of those who can work are employed. Residents also serve as

staff at the shelter to help their fellow residents secure access to needed help.

**2.       CCNV Acquires Properties Behind Federal City Shelter**

12.     The Federal Property and Administrative Services Act of 1949, 40 U.S.C. 484(k),

("FPASA") authorizes the United States to convey surplus real property to a nonprofit entity for

"public-health purposes."

13.     Title V of the Stewart B. McKinney Homeless Assistance Act of 1987 ("McKinney

Act") requires federal agencies to make their unneeded property available to eligible organizations

to assist persons experiencing homelessness. *See* 42 U.S.C. § 11411.

14.     By Quitclaim Deed dated November 9, 1993 ("Deed"), the United States, acting

through HHS, conveyed to CCNV approximately 0.84 acres of land and one small building located

immediately behind the Federal City Shelter. A copy of the Deed is attached to this Complaint as

Exhibit 1. The Deed recites that the properties were conveyed pursuant to the FPASA and the

McKinney Act. *See* Exhibit 1 at p. 1.

15.     As reflected in the drawing which the parties attached to the Deed (labeled as

"Square 571"), the conveyed properties comprised 12 small lots which were being used at that

time as parking lots fronting E Street and in the interior of the square (separated from the Shelter

6

by the square's internal alley system), plus a lot containing a small building fronting on D Street. A copy of the drawing attached to the Deed is also attached to this Complaint as Exhibit 2.

16.   The Deed contains written conditions regarding the conveyed properties. There were essentially seven conditions expressed in the Deed—six conditions expressed in numbered paragraphs in the Deed and one expressed in a Memorandum of Understanding attached to the Deed. The latter condition involves an agreement between the GSA and the District of Columbia to provide the District with surface parking for 37 vehicles; that condition is not implicated in the facts underlying this complaint, except that there has been no suggestion that the condition has not been complied with.

17.   The other six numbered conditions, *see* Exhibit 1 at pp. 2-3, focus on the use of the conveyed properties by CCNV and the continuous use of the properties for the program and plan advanced by CCNV when it sought to acquire the properties. These numbered conditions had a limited lifespan; that is, they applied only for a period of 30 years from July 3, 1991: "[F]or a period of thirty (30) years from July 3, 1991, the Property herein conveyed will be used continuously for health purposes in accordance with the proposed program and plan of the Grantee [CCNV] as set forth in its application dated the 13th of August 1993, and for no other purpose." (Condition 1.) The conditions set forth in the Deed expire as of July 3, 2021, only a few months from now, at which time CCNV's title will be free of the conditions (except for CCNV's requirement to comply with certain non-discrimination provisions as a recipient of federal assistance, as set forth in Condition 6, a requirement that is not implicated in this lawsuit). Nevertheless, even after the Deed conditions have expired, CCNV fully intends to continue operating its programming on the properties.

18.    CCNV has complied with its obligations under the Deed and has observed the conditions. Specifically, the conveyed properties have been utilized by CCNV continuously for purposes of assisting the homeless community and for the advancement of public-health goals and health purposes, consistent with the FPASA and the McKinney Act and as envisioned in CCNV's plans. Indeed, CCNV has been able to expand its services to homeless citizens by using the conveyed properties for, among other things, support of vocational training, support of food service for those experiencing homelessness both in the Federal City Shelter and throughout the area, alcohol and drug rehabilitation programs, and other purposes. CCNV has not used the properties for purposes unrelated to or inconsistent with CCNV's mission and goals or unrelated to the missions and goals of the FPASA and the McKinney Act.

19.    The Deed created a possibility of reverter running to the United States. A "possibility of reverter" is a species of future interest through which the grantor may be able to retake ownership of the fee at the end of a defeasible estate. Here, the Deed contained an express and limited possibility of reverter:

> In the event of a breach of any of the conditions subsequent set forth above, whether caused by the legal or other inability of the Grantee, its successors and assigns, to perform any of the obligations herein set forth, the Grantor or its successor in function will, at its option, have an immediate right of reentry thereon, and to cause all right, title, and interest in and to the Property to revert to the United States of America…PROVIDED FURTHER that in the event the Grantor or its successor in function fails to exercise its option to reenter the premises and to revert title thereto for any such breach of conditions numbered 1, 2, 3, 4, or 5 herein within thirty-one (31) years from the date of this conveyance, conditions numbered 1, 2, 3, 4, and 5 herein, together with all rights to reenter and revert title for breach of condition, will, as of that date, terminate and be extinguished; [with the exception of the possibility of reverter for breach of the non-discrimination provisions under Condition 6]. (Exhibit 1 at 3-4.)

20.    Thus, under the Deed, CCNV acquired the fee, agreed to comply with conditions for a stated period which expires in July 2021, after which period the properties would not be

subject to the conditions, save the one condition regarding non-discrimination as a recipient of federal funding. The Deed also expressly allowed the United States to abrogate the conditions upon request by CCNV and payment of an abrogation amount of money to the United States. (Deed at 6.)

### 3.   Operations under the Deed and HHS Efforts to Take Back the Properties

21.   As alleged above, through the 30-year term of the conditions, CCNV has owned and operated the deeded properties consistent with its obligations, and has provided invaluable support and public-health services for the homeless in accordance with the FAPSA and the McKinney Act.

22.   In mid-2018, CCNV approached the United States (HHS) about the possibility of using the properties for creation of a new homeless-services center, working together with the District of Columbia. With the properties soon to be owned outright by CCNV (at the end of the period of the conditions), CCNV sought approval to convert the properties earlier so that financing could be secured and the project could proceed more expeditiously to address the needs of those experiencing homelessness. The application was supported by the District of Columbia. The District of Columbia has recognized that due to their age and deterioration, the physical conditions in the vast majority of its shelters are "simply unacceptable and offer very little to help reduce the trauma of whatever life events have led individuals and families to shelter. *See* District of Columbia Interagency Council on Homelessness—Strategic Plan 2015-2016 at 36. The Federal City Shelter is one of the buildings owned by the District of Columbia in need of replacement or significant improvement due to its poor and deteriorating condition, a fact well-recognized by the District of Columbia and CCNV.

23.     Rather than consent to CCNV's 2018 proposal to use the short remaining term of the Deed to get a head start on significantly improving homeless-shelter facilities in the District of Columbia, the United States (HHS) manufactured claims of "problems" or "unapproved" uses of the properties. For example, even though the Deed itself specified the then-current use of a portion of the subject real estate for parking and even though D.C. Central Kitchen had been working with CCNV and on the block for over 25 years—with the full knowledge of the United States—HHS claimed in an October 2, 2019 letter that D.C. Central Kitchen's use of some of the surface parking in connection with CCNV's program had not been "approved," and, further, that some of the services provided by D.C. Central Kitchen were not eligible programs under either the FPASA, the McKinney Act or the Deed "even if such programs serve a public health-related purpose." Yet, in that same letter, HHS conceded that D.C. Central Kitchen's use of the parking lot had earlier been determined to be an "eligible use" and "was approved as part of CCNV's successful application for the Property." In a May 10, 2019 letter, HHS took the position that parking to support what it had described as "homeless assistance operations" was not an approved use. HHS also made the specious claim in a September 20, 2018 letter rejecting CCNV's application for repurposing that CCNV had not demonstrated experience in providing homeless services—this despite the unparalleled record of over 30 years of CCNV providing homeless services to a large number of homeless residents. There were similarly flimsy allegations about other matters, none of which allegations were proven or material.

24.     Ultimately, HHS announced that it would not consent to the repurposing of the properties as requested by CCNV. This has significantly delayed tireless efforts by CCNV to improve the conditions of those experiencing homelessness. HHS did not give a plausible reason to refuse this request nor any concrete, objective basis to withhold its consent to a revised use of the

properties that would advance public-health interests and civic-service goals. HHS even took the outrageous position in an April 3, 2019 letter that CCNV must acknowledge non-compliance with the conditions in the Deed in exchange for a short extension to respond to certain options presented by HHS. Upon information and belief, HHS wanted to renege on its agreement in the Deed that the conditions expired so that HHS could take advantage of the increased value of the properties or otherwise extend its hold on the properties long after it had agreed to let the possibility of reverter terminate. In fact, a representative of GSA stated during a 2015 tour of the properties that the "highest and best" use of the properties would be for commercial purposes due to their increased value, rather than serving the homeless. Indeed, when HHS later claimed that CCNV had not complied with Deed conditions, it also said in a March 20, 2019 letter it would consider another application for repurposing if CCNV agreed to extend the Deed restrictions for an additional 15 years. However HHS provided no assurance that it would approve such an application to allow the operation of a much-needed homeless services complex on the properties. CCNV refused to cave in to this pressure tactic in which HHS sought to undermine the provisions of the Deed and contort the proper interpretation of the Deed conditions.

25.    On October 14, 2020, during the COVID pandemic and with winter fast approaching, HHS, acting with GSA, filed with the Recorder of Deeds of the District of Columbia a "Notice of Reverter" against the properties which belong to CCNV. *See* Exhibit 3. The Notice of Reverter states that CCNV "has committed a substantial breach of condition subsequent number 1 of said Quitclaim Deed for failing to continuously utilize the property in accordance with its approved program of use." The Notice provides no evidence in support of this assertion. Indeed, HHS's extreme overreach is demonstrated by the fact that the Notice of Reverter even applies to those

properties which have been reserved for parking for the District of Columbia under the Deed, even though HHS has never claimed any non-compliance with that requirement.

26.     The statements in the Notice of Reverter that there has been a "substantial breach" of Condition 1 of the Deed is false. The Notice is also false in asserting that the properties have not been utilized continuously in accordance with the approved program of use.

27.     Although the Notice is false and therefore should not constitute a basis for the assertion of rights in the property by the United States, HHS has further purported to demand possession of the properties that belongs to CCNV.

28.     On November 13, 2020, CCNV filed with the Recorder of Deeds an Objection to the Notice of Reverter. *See* Exhibit 4. Although the public is now aware that the Notice of Reverter should be deemed ineffective, nevertheless the filing by the United States clouds CCNV's title and improperly asserts control by the United States over CCNV's properties.

## COUNT ONE
### (Quiet Title)

29.     The allegations of Paragraphs 1-28 are incorporated into this Count by reference.

30.     As evidenced by the Deed, CCNV is the lawful owner of Square 571, Lots 8, 29, 30, 33, 34, 35, 806, 807, 808, 809, 812, and 813.

31.     Although the Deed created a possibility of reverter to the benefit of the United States, the conditions required for that possibility of reverter to be exercisable have not occurred nor has the United States properly exercised any option to have the properties reconveyed to it.

32.     The Notice of Reverter is not valid and it should be removed from the title to the properties.

33.     Under 28 U.S.C. §2201 and §2202, this Court has the authority to issue a judgment determining that the United States does not have ownership of the properties and is not authorized

to exercise its possibility of reverter and, further, to quiet title in CCNV by removing the Notice of Reverter from the chain of title.

WHEREFORE, CCNV respectfully requests that title to the properties be quieted in CCNV and that the Notice of Reverter be declared ineffective and void.

## COUNT TWO
### (Breach of contract)

34.    The allegations of Paragraphs 1-33 are incorporated by reference in this Count.

35.    The Deed constitutes a contract between the United States and CCNV.

36.    CCNV has performed all of its obligations under the Deed.

37.    The United States beached its obligations under the Deed when it failed, without reason, to consent to CCNV's request to modify the conditions so that CCNV could use the properties in connection with its proposed new homeless-service program. That refusal to consent violated the implied duty of good faith and fair dealing inherent in the Deed. The refusal and the subsequent efforts by the United States to extend the period during which the Deed conditions would encumber CCNV's ownership also breached the agreement in the Deed which limited the scope and duration of the conditions.

38.    The United States also breached the Deed by filing the Notice of Reverter at a time when the prerequisites to an authorized exercise of the possibility of reverter had not occurred.

39.    The breaches of contract by the United States caused and are causing monetary damage to CCNV in the form of lost opportunities and increased development costs, as well as damage to CCNV's title.

40.    Critically, the breaches of contract by the United States are also damaging CCNV's clients, the homeless men and women of the District of Columbia who look to CCNV to provide needed homeless and related services without interruption.

WHEREFORE, CCNV requests entry of a judgment against the United States for breach of contract and an award of damages in an amount to be proven at trial but estimated to be not less than $100,000, and such other and further relief as the Court finds to be appropriate.

## COUNT THREE
### (Administrative Procedure Act)

41.     The allegations of Paragraphs 1-40 are incorporated by reference in this Count.

42.     Under the Administrative Procedure Act, 5 U.S.C. §706(2)(A), this Court has the authority to set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

43.     HHS's purported exercise of the possibility of reverter was an agency action without support in the factual record. It was also invoked without adequate process and without identifying a rational connection between the facts and the decision to purport to exercise the possibility of reverter. Among other things, HHS and GSA did not have a basis to determine that there had been a "substantial breach" of Covenant 1 and did not determine that a purported breach was material to any legitimate interest of HHS or the United States. To the contrary, the agency's purported rationale for exercising the possibility of reverter was a breach of contract by HHS.

44.     HHS acted arbitrarily and capriciously because its action was driven by the desire to breach the Deed and to prevent the exercise of property rights by CCNV. The reasons advanced by HHS were makeweight and were not supported by the facts. Whereas it is the stated goal of the Deed, the FPASA, and the McKinney Act to provide resources to assist the homeless and for public-health purposes, HHS's and GSA's actions undermine those goals and lack substance.

WHEREFORE, CCNV requests entry of an order setting aside the action of HHS exercising the possibility of reverter.

On all counts, CCNV requests such other and additional relief as the Court finds just and

equitable. CCNV also requests an award of attorneys' fees and costs of suit.


Respectfully submitted,

/s Paul J. Kiernan
Paul J. Kiernan (D.C. Bar No. 385627)
Christopher Cohen (D.C. Bar No. 1044230)
        (*pro hac vice* motion forthcoming)
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Phone: 202-663-7276
Fax: 202-955-5564
Email: paul.kiernan@hklaw.com
Email: christopher.cohen@hklaw.com


/s John G. Calender
John G. Calender (D.C. Bar No. 939124)
Baker, Donelson, Bearman, Caldwell &
 Berkowitz, P.C
901 K Street, N.W.
Suite 900
Washington, D.C. 20001
Email: jcalender@bakerdonelson.com